IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

PAMELA DEE PERRY,                              )
           Plaintiff,                    )
                                         )
v.                                             )        CIVIL ACTION NO. 2:15-01145
                                         )
CAROLYN. W. COLVIN,                            )
Acting Commissioner of Social Security,        )
           Defendant.                    )

PROPOSED FINDINGS AND RECOMMENDATION

       This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Standing Orders entered February 17, 2015 January 5, 2016 (Document Nos. 3 and 11.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 8 and 9.), and Plaintiff's Reply. (Document No. 10.)

       The Plaintiff, Pamela D. Perry (hereinafter referred to as "Claimant"), filed an application for DIB on May 26, 2011 (protective filing date), alleging disability as of December 15, 2009, due to depression, anxiety, low blood sodium, spasms in legs, concussion at work, nausea, no appetite, body weakness, and insomnia.[1] (Tr. at 12, 125, 126-32, 163.) The claim was denied initially and upon reconsideration. (Tr. at 12, 64-65, 68-70, 74-76.) On January 20, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 12, 77-80.) A hearing was held on

---

[1] Claimant later amended her alleged onset date to October 1, 2010. (Tr. at 12, 155.)

July 12, 2013, before the Honorable I. Kay Herrington. (Tr. at 12, 27-63.) By decision dated August 21, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-22.) The ALJ's decision became the final decision of the Commissioner on December 2, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on January 28, 2015, pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the

2

Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the amended alleged onset date, October 10, 2010. (Tr. at 14, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "hyperlipidemia and osteoarthritis of the hands," which were severe impairments. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity for light work, as follows:

> [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) except he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds and should avoid concentrated exposure to extreme cold, extreme heat, vibration, unprotected heights, and dangerous moving machinery.

(Tr. at 18, Finding No. 5.) At step four, the ALJ found that Claimant was able to perform her past relevant work as an administrative assistant. (Tr. at 21, Finding No. 6.) On this basis, benefits were denied. (Tr. at 21, Finding No. 7.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying

3

the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on May 25, 1950, and was 63 years old at the time of the administrative hearing on July 12, 2013. (Tr. at 126.) Claimant had at least a high school education and was able to communicate in English. (Tr. at 162, 164.) In the past, she worked as an administrative assistant. (Tr. at 21, 58, 165, 180-87.)

<u>The Medical Record</u>

The Court has considered all evidence of record, including the medical evidence and will summarize it and discuss it below in relation to Claimant's arguments.

In 2008, Claimant sought treatment from Brett H. Foreman, M.D., at Carolina Family Practice. (Tr. at 261-87.) Dr. Forman diagnosed, inter alia, hyperlipidemia, osteoarthritis of the

hands, hypertension, mild depression, and anxiety. (Id.) Physical and mental status exams essentially were unremarkable. (Id.) Claimant reported increased anxiety and depression on February 3, 2009, with increased problems sleeping and with short term memory. (Tr. at 288-91.) Mental and physical examinations were normal. (Tr. at 290.) Dr. Foreman adjusted her medications and noted that her sleep and short term memory issues most likely arose from her poor sleep patterns and anxiety and not a medication side effect. (Id.)

On July 28, 2009, Claimant sought follow-up treatment from Dr. Kapil Rawal, M.D., a neurologist, following an injury at work on July 6, 2009, when she hit her head on the freezer door when removing her lunch from the refrigerator. (Tr. at 247-48.) She was diagnosed with a contusion and possible concussion. (Tr. at 247.) Claimant returned to work on July 20, and tolerated fairly well working half days with less headaches, until she became dizzy and exhausted. (Id.) Dr. Rawal noted that Claimant was 80% better since the injury. (Id.) On physical examination, Claimant presented with a mildly stiff neck, paravertebral tenderness in the lower cervical and upper thoracic region, normal mental status, normal motor and sensory functions, normal and symmetrical reflexes, and normal gait and station. (Id.) Dr. Rawal diagnosed status post closed head injury with concussion, post concussive syndrome, post traumatic vascular headaches, and cervical sprain. (Id.) Dr. Rawal recommended that Claimant work four hours per day until the beginning of August, when she could increase to six hours a day, and finally resume full duties without restriction in mid-August. (Tr. at 248.) Dr. Rawal opined that pharmaceutical intervention was unnecessary and that she most likely would achieve maximum medical improvement in two months. (Id.)

On August 8, 2009, Claimant returned to Dr. Foreman with complaints of sinus symptoms, gait changes, weakness, and cognitive changes. (Tr. at 314-16.) Physical and mental status

examinations were normal and Claimant presented with a normal gait. (Tr. at 315-16.) Dr. Foreman recommended that Claimant follow-up with neurology as he "would expect more improvement if related to post-concussive symptoms." (Tr. at 316.)

On August 11, 2009, Claimant presented to Dr. Rawal with complaints of dizziness, weakness, and persistent lack of energy. (Tr. at 249.) Dr. Rawal recommended an MRI of the brain. (Id.) An MRI of the brain on August 13, 2009, was normal. (Tr. at 251.)

Claimant returned to Dr. Foreman on August 14, 2009, with complaints of fatigue. (Tr. at 317-19.) Dr. Foreman opined that the fatigue probably was a stress reaction but ordered blood tests. (Tr. at 319.) On August 19, 2009, Claimant presented with complaints of heart palpitations that she did not believe resulted from anxiety, though she had returned to work. (Tr. at 320.) Physical examination was unremarkable and blood tests and an EKG were normal. (Tr. at 321-22.) Dr. David L. Becker, M.D., prescribed Ativan and referred Claimant to Carolina Cardiology. (Tr. at 322.)

On September 29, 2009, Claimant reported that she was "doing great and feeling a lot better." (Tr. at 250.) Claimant's dizziness, headaches, and memory issues had resolved and Dr. Rawal noted that she had no difficulty walking, balance, or coordination. (Id.) Neurological examination was normal. (Id.) Dr. Rawal opined that Claimant had reached maximum medical improvement and that there was no permanent partial impairment rating applicable. (Id.) He further opined that Claimant was able to return to full duties without any restrictions. (Id.)

Claimant was admitted to Duke Raleigh Hospital on November 20, 2009, by Yamadi Asghar, M.D., for recurrent weakness, nausea, and hyponatremia. (Tr. at 253-55.) She had been discharged from the emergency room two days prior and was advised to discontinue her diuretic. (Tr. at 253.) Dr. Gregory Ingram, M.D., discharged Claimant on November 22, with the diagnoses

6

of hyponatremia secondary to excessive free water intake, weakness and nausea secondary to hyponatremia, elevated lipase, hypertension, and depression. (Tr. at 255.) Dr. Ingram recommended that she restrict her water consumption and that if that did not help, he suggested that she most likely would benefit from an endocrinology consult. (Tr. at 256.)

Claimant followed up with Dr. Foreman on November 24, 2009. (Tr. at 335-36.) Physical and mental examinations were unremarkable, with the exception of some nasal drainage and Eustachian tube dysfunction, and Dr. Foreman noted that Claimant's recent and remote memory, judgment and insight, and mood and affect were intact. (Tr. at 336.) On December 7, 2009, Claimant complained of decreased appetite, difficulty falling asleep, a significant increase in anxiety, increased symptoms of depression, anhedonia, mental and motor restlessness, and decreased physical exercise. (Tr.at 339.) Dr. Foreman noted that Claimant's hyponatremia had improved significantly since her hospitalization. (Id.) Claimant's mental status was normal except for anxious and depressed mood. (Tr. at 340.) Dr. Foreman assessed acute stress reaction related to her recent hospitalization and prescribed Xanax. (Tr. at 341.) He further recommended that Claimant diet, exercise, and avoid caffeine. (Id.)

Claimant returned to Dr. Foreman the following week, December 14, 2009, similar symptoms from the last visit. (Tr. at 342.) Dr. Foreman noted an anxious and depressed mood, diagnosed major depressive disorder, and recommended a two-week absence from work. (Tr. at 343-44.) Claimant followed-up with Dr. Foreman on December 28, 2009, and reported that her symptoms had improved while visiting family, but significantly declined when she returned home. (Tr. at 345.) Mental status examination revealed a significantly depressed mood, thoughts of suicide without specific plan, feelings of hopelessness, increased anxiety, insomnia, and anorexia. (Tr. at 346.) Dr. Foreman diagnosed worsening major depressive disorder and recommended

further evaluation. (Tr. at 347.) He noted that he did not think Claimant was safe to continue at home. (Id.)

Claimant treated with Dr. David Reid, M.D., from January 4, 2010, through April 13, 2010. (Tr. at 374-85.) In January 2010, Claimant reported that she was down, worried, and that her Ativan made her "dull." (Tr. at 375.) Dr. Reid continued her Seroquel but replaced Lexapro with Effexor. (Id.) Dr. Reid reported that he spoke with Claimant's human resource department about her reducing her work to part-time. (Id.) On January 21, 2010, Claimant reported that she had a "very bad day" and that there was "no way" she could work full time. (Tr. at 376.) She stated that she had anxiety over her job because it was hard to do. (Id.) Dr. Reid noted Claimant's reports of a concussion in July, but noted that a CT scan in August was within normal limits. (Id.) On February 8, 2010, Claimant reported that she hated her job because there was not enough to do and she was bored. (Tr. at 377.) Dr. Reid noted that Claimant's mind was clearer and that she had increased concentration. (Id.)

On March 3, 2010, Dr. Reid sent Claimant to Durham Regional Hospital for risk of suicide. (Tr. at 378.) Claimant presented to the hospital with depressed feelings, decreased appetite, and weight loss over the last three months. (Tr. at 258.) Mental status examination was unremarkable. (Tr. at 259.) An MRI of the brain, on March 6, 2010, essentially was normal, with rare scattered nonspecific foci of the T2 prolongation, commonly incidental. (Tr. at 260.) Claimant was discharged on March 8, 2010. (Tr. at 378.)

Claimant returned to Dr. Reid on March 29, 2010. (Tr. at 384.) Dr. Reid noted that she seemed slightly better, but noted Claimant's reports of continued depression. (Id.) On April 7, 2010, Claimant reported that she remained very depressed and felt a lot of anxiety. (Tr. at 379.) Dr. Reid advised Claimant to restart Zyprexa. (Id.) On April 13, 2010, Claimant reported that

although she wanted to return to work, she was too nervous to do so. (Tr. at 385.) Dr. Reid noted that Claimant's physical condition was "healthier." (Id.) Claimant reported that she had felt better emotionally since January, was sleeping good, and had a better appetite. (Id.) On May 5, 2010, Claimant reported that she felt "really good" and that her sleep and appetite were great. (Tr. at 380.) On June 29, 2010, however, Claimant reported increased anxiety, depression, and decreased sleep. (Id.) She stated that she was unable to look for a job. (Id.)

Claimant sought treatment from Gary J. Tucker, M.D., a family practitioner, on June 9, 2010, for problems with depression and recent major life changes. (Tr. at 409-10.) Claimant reported however, that she was "feeling ok now." (Tr. at 409.) Physical examination was unremarkable with the exception of benign skin lesions. (Tr. at 410.) Dr. Tucker assessed uncontrolled hypertension and hyperlipidemia, history of shingles and hyponatremia, and osteoarthritis of the hands, and adjusted her medications. (Id.)

Claimant presented to Debra Simone, C.F.N.P., on June 23, 2010, for a comprehensive psychiatric evaluation and for diagnosis and treatment of her depression and anxiety. (Tr. at 419-20, 429-30.) Claimant reported that she was hospitalized for one week for depression and suicidal ideation. (Tr. at 419.) Ms. Simone noted that Claimant had moved back to West Virginia, where she continued to experience symptoms of depression and anxiety. (Id.) On mental status examination, Ms. Simone noted that Claimant was neat in appearance and appropriately dressed, had a depressed mood and affect, presented with fair insight and judgment, and had poor attention span and concentration. (Tr. at 420, 429.) Mental status exam was unremarkable in all other respects. (Id.) Claimant denied any suicidal or homicidal ideations, intent, or plan. (Id.) Ms. Simone diagnosed major depression, recurrent, moderate and anxiety disorder NOS. (Id.) She also assessed a GAF of 65. (Id.) Ms. Simone recommended individual therapy, but Claimant refused

and stated that therapy was not helpful in the past. (Id.) Ms. Simone therefore increased her Prozac and Klonopin. (Id.)

Claimant returned to Ms. Simone on July 7, 2010, and stated that she was "not good" and was "barely functioning." (Tr. at 427.) Claimant reported that she felt completely out of control and barely was able to function. (Tr. at 428.) Mental status examination revealed depressed mood and affect, fair insight and judgment, poor attention span and concentration, relevant thought content, clear and coherent speech, intact association, normal psychomotor activity, and intact recent and remote memory. (Tr. at 427-28.) Ms. Simone again recommended that Claimant see a therapist. (Tr. at 428.)

On July 13, 2010, Claimant sought emergency treatment at Camden Clark Memorial Hospital for depression. (Tr. at 398.) Dr. Matthew M. Bushmam, P.A., diagnosed depression and recommended that Claimant follow-up with her family physician. (Tr. at 396, 398.)

Claimant followed up with Dr. Tucker on July 15, 2010. (Tr. at 408.) Dr. Tucker noted Claimant's reports that she was not sleeping well and was "not doing well." (Id.) Physical exam was unremarkable. (Id.) Dr. Tucker noted that Claimant's hypertension was controlled and that her hyponatremia was resolved. (Id.)

On August 3, 2010, Claimant returned to Ms. Simone and reported that she may want to stop the Abilify due to the cost. (Tr. at 425.) Claimant reported that she felt calm, was not worried about things, and that her depression was "much better." (Tr. at 426.) Mental status exam revealed a pleasant mood and appropriate affect, relevant thought content, clear and coherent speech, fair insight and judgment, good attention span and concentration, intact associations, and normal psychomotor activity. (Tr. at 425.) Ms. Simone continued Claimant's medications, having noted that they were helping, and gave her samples of Abilify. (Tr. at 426.)

Claimant followed-up with Ms. Simone on December 8, 2010, for a medication check. (Tr. at 423-24.) She further reported "real good" sleep and good appetite. (Tr. at 423.) Mental status exam revealed a pleasant mood and appropriate affect, relevant thought content, clear thought process and speech, full orientation, normal psychomotor activity, fair insight and judgment, intact associations, and an ability to focus and get things done. (Id.) Ms. Simone noted that Claimant was doing well, that her mood had improved, that her depression was much better, and that she had obtained a part-time job. (Tr. at 424.) She continued Claimant's medication. (Id.)

On January 5, 2011, Claimant returned to Dr. Tucker for follow-up examination. (Tr. at 407.) He noted that Claimant was still depressed and continued her medications. (Id.)

Claimant presented to Ms. Simone on May 5, 2011, for a medication check, and reported that she was "ok" but that her depression had been "pretty bad" for the last three weeks. (Tr. at 421.) She noted that her mother had passed away three months ago and that she had started a new, better job. (Id.) Mental status exam revealed a calm mood and pleasant affect, relevant thought content, clear thought process and speech, full orientation, normal psychomotor activity, fair insight and judgment, normal attention span and concentration, and fair insight. (Id.) She denied suicidal or homicidal ideation. (Id.) Ms. Simone noted that Claimant felt sad, lacked motivation, and had too much free time on her hands. (Tr. at 422.) Claimant reported that she received counseling through her church. (Id.)

Claimant called Ms. Simone on May 12, 2011, and advised that her depression had worsened due to the Abilify. (Tr. at 435.) Despite Ms. Simone's recommendations to wean slowly off the Abilify, Claimant reported that she was going to stop it and take only Prozac. (Id.) Claimant reported on June 20, 2011, that she was experiencing symptoms of withdrawal because she had stopped the Klonopin, "cold turkey." (Tr. at 433-34.) On June 29, 2011, Claimant advised by

11

telephone that she had been nauseated, was not functioning well, and barely was able to get through the day. (Tr. at 432.) She stated that she did not want to live another day. (Id.) Ms. Simone encouraged Claimant to report to the hospital and to continue taking Abilify. (Id.) On July 11, 2011, Ms. Simone advised that she did not think the Prozac was causing Claimant's nausea and indigestion, but if she wanted to split the dose that was acceptable. (Tr. at 431.)

Claimant initiated treatment with Brandon Wolfe, D.O., on July 21, 2011. (Tr. at 479-81.) She reported a history of major depression and remote suicidal thoughts and that she had been taking Prozac with persistent depression. (Tr. at 479.) Physical examination was unremarkable and Dr. Wolfe assessed hypertension, hyperlipidemia, and major depression. (Tr. at 479-80.) He prescribed Zoloft 100mg. (Id.)

Dr. Fulvio Franyutti, M.D., a State agency reviewing medical consultant completed a form Physical RFC Assessment on August 10, 2011. (Tr. at 436-44.) Dr. Franyutti opined that despite Claimant's improved mild concussion, hyponamtremia, and osteoarthritis of the hands, she was capable of performing light exertional work except that she never could climb ladders, ropes, or scaffolds and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. (Tr. at 436-39.) He further opined that Claimant should avoid concentrated exposure to temperature extremes, vibration, and work hazards. (Tr. at 440.) Dr. Franyutti noted that Claimant's activities of daily living included working 15 hours per week, cleaning, doing laundry, performing household repairs, ironing, watching television, reading, driving, shopping in stores, and handling money. (Tr. at 443.) Dr. Franyutti noted that Claimant's treating neurologist released her from his care in September 2009. (Id.) He further noted that Claimant's hyponatremia was secondary to excessive free water intake and that the hyponatremia was why she was weak and nauseated. (Id.) Dr. Porifirio Pascasio, M.D., another State agency reviewing medical consultant,

reviewed all the evidence of record and affirmed Dr. Franyutti's assessment, as written. (Tr. at 511-12.)

Claimant returned to Dr. Wolfe on August 18, 2011, for follow-up examination. (Tr. at 482-84, 501-03.) She reported that the Zoloft worked well, but made her mouth dry. (Tr. at 482, 501.) Examination was unremarkable and Dr. Wolfe assessed hypertension and major depression. (Tr. at 483, 502.)

On September 14, 2011, Amy Guthrie, M.A., a licensed psychologist, conducted a mental status examination. (Tr. at 445-51.) Claimant reported that she was working part-time as a receptionist, but later called to advise that she was fired from her job. (Tr. at 447.) Claimant complaints of occasional bouts of insomnia, crying spells twice a week, fluctuating energy levels, varied appetite, depressed mood, waning anxiety, performance anxiety, and excessive worry. (Tr. at 446.) On mental status exam, Claimant was cooperative, presented with coherent and relevant speech, was oriented, and had a depressed mood and restricted affect. (Tr. at 447.) Thought processes generally were coherent, but she had some mental confusion. (Id.) Ms. Guthrie assessed normal insight, psychomotor behavior, immediate and remote memory, and persistence. (Tr. at 447-48.) Claimant's recent memory was markedly deficient and her concentration, pace, and social functioning were mildly deficient. (Tr. at 448.) Ms. Guthrie noted Claimant's daily activities to have included cleaning house, reading, doing crossword puzzles, caring for her personal hygiene, cooking, washing dishes, doing laundry, listening to music, walking four to five times a day, and driving. (Id.) She also noted that Claimant went out to dinner four times a week with family and friends, attended church twice a week, visited family and friends and received visits from them, talked on the phone, used email, used Facebook on a regular basis, and went grocery shopping two to three times a week. (Id.)

13

Ms. Guthrie diagnosed major depressive disorder, recurrent, moderate, and cognitive disorder not otherwise specified. (Tr. at 448.) Her diagnosis of major depressive disorder was based on Claimant's self-reported crying spells, fluctuating energy levels, varied appetite,  and depressed mood. (Tr. at 448-49.) Ms. Guthrie's diagnosis of cognitive disorder was based on Claimant's self-report that she experienced mental confusion, memory impairment, and was unable to complete job tasks since her concussion and low sodium problems. (Tr. at 449.) Ms. Guthrie opined that Claimant's prognosis was guarded due to physical health problems. (Id.)

Jeff Boggess, Ph.D., conducted a review of the evidence of record and completed a form Psychiatric Review Technique, on September 19, 2011. (Tr. at 452-66.) Dr. Boggess opined that Claimant's major depressive and anxiety disorders were non-severe impairments, that resulted in no limitations of daily activities or social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Id.) Dr. Boggess noted that Claimant's treating diagnoses were major depressive disorder and anxiety NOS. (Tr. at 464.) He concluded that because Ms. Guthrie's mental status exam revealed only mildly deficient concentration and relatively normal self-reported social functioning, her reliance on Claimant's self-reports was insufficient and inappropriate to support her diagnoses. (Id.) He further opined that Claimant's self-reported daily activities failed to support significant functional limitations. (Id.)

Claimant returned to Dr. Wolfe on September 30, 2011, reporting that her blood pressure ran high at home. (Tr. at 486,505-07.) Dr. Wolfe discontinued Claimant's Zoloft due to dry mouth and started her on Lexapro and changed her blood pressure medication. (Tr. at 487, 506.) On November 2, 2011, Claimant reported leg cramps from the new blood pressure medication, Lisinopril. (Tr. at 492.) On December 2, 2011, Claimant reported that she had not "felt good for a

long time." (Tr. at 537.) She stated that her depression had increased in severity and that she was "real depressed" during the examination. (Id.) Claimant believed that the Zoloft was working well, with decreased depression. (Id.) Dr. Wolfe diagnosed hyperlipidemia, hypertension, and major depressive disorder, recurrent. (Tr. at 538.)

On December 8, 2011, Atiya M. Lateef, M.D., a State agency reviewing medical consultant, completed a form Physical RFC Assessment, on which she opined that based upon normal physical findings on examination on November 2, 2011, Claimant did not have a severe physical impairment. (Tr. at 513-21.) She noted that Claimant's daily activities were more restricted due to her psychological-related issues. (Tr. at 518.)

Debra Lilly, Ph.D., completed a form Psychiatric Review Technique, on December 16, 2011, on which she opined that Claimant's cognitive disorder and major depression were non-severe impairments, that resulted in mild limitations in daily activities, social functioning, concentration, persistence, or pace and no episodes of decompensation of extended duration. (Tr. at 522-36.) Dr. Lilly noted that Claimant was working 15 hours a week as an administrative assistant, a job that she obtained after having been fired from her previous job, and no longer was seeing her treating mental sources but was seeing her regular physician. (Tr. at 534.) Dr. Lilly further noted that the objective evidence did not reflect the severity of Claimant's alleged limitations. (Id.)

On January 10, 2012, Claimant presented to Dr. Wolfe with complaints of elevated blood pressure and that she had discontinued the HCTZ due to leg cramps. (Tr. at 540.) Dr. Wolfe assessed hypertension and advised Claimant to restart the HCTZ. (Id.) Claimant returned to Dr. Wolfe on March 26, 2012, with complaints of dizziness, fatigue, myalgia, headaches, and heart palpitations on exercise. (Tr. at 545.) Examination was unremarkable and Dr. Wolfe assessed

15

palpitations, benign hypertension, hyperlipidemia, GERD, and major depressive disorder, recurrent. (Tr. at 545-46.) He ordered an EKG. (Tr. at 546.)

Claimant followed-up with Dr. Wolfe for her yearly examination on January 17, 2013, a which time she reported that she felt well. (Tr. at 551.) Dr. Wolfe noted that Claimant's bloodwork from August, essentially was normal. (Id.) He continued her diagnoses and medications. (Tr. at 552.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider all of her severe and non-severe impairments in assessing her RFC. (Document No. 8 at 6-10.) Specifically, Claimant asserts that the ALJ failed to include any limitations accounting for her post-concussion syndrome, major depressive disorder, and generalized anxiety disorder; failed to consider the findings of Ms. Guthrie respecting her findings that claimant had markedly deficient memory, mildly deficient concentration, and mildly slow pace; failed to include any manipulative limitations to account for Claimant's osteoarthritis of the hands; and failed to consider her statements of limitations contained in the form Adult Function report, dated June 29, 2011. (Id. at 8-9.) Claimant contends that had the ALJ concluded that she was unable to perform any past relevant work, Medical-Vocational Rule 202.06, would have directed a finding of disability. (Id. at 9.) Finally, Claimant asserts that the ALJ failed to set forth all of Claimant's impairments in the hypothetical questions to the VE. (Id.)

In response, the Commissioner asserts that Claimant's argument entirely is without record support. (Document No. 9 at 20.) The Commissioner first asserts that Claimant failed to meet her burden at step four because she was working 15 hours per week in an office setting where she coordinated and attended board meetings, handled correspondence and incoming mail, and mail

16

bulletins. (Id. at 18.) The Commissioner therefore contends that Claimant's "work after her alleged onset date, even though it did not constitute substantial gainful activity, is probative evidence she may be capable of working more than she actually did." (Id.) The Commissioner next asserts that two State agency psychologists found no severe impairment and neither Ms. Guthrie nor any of Claimant's treating physicians assigned any work restrictions, despite their findings. (Id.) Regarding manipulative limitations, the Commissioner asserts that the record is void of any physician having stated or implied that she required such limitations due to her osteoarthritis of the hands. (Id.) The Commissioner notes that Dr. Franyutti specifically declined not to assess any manipulative limitations. (Id.) Finally, regarding Medical-Vocational Rule 202.06, the Commissioner asserts that the Rule is inapplicable because the VE testified that Claimant had transferable skills. (Id.) The VE identified light work that Claimant was capable of performing, with her transferable skills. (Id.) Contrary to Claimant's argument, the Commissioner asserts that she would not have been found disabled at step five. (Id.) Accordingly, the Commissioner contends that the ALJ properly assessed Claimant's RFC. (Id. at 20-21.)

In Reply, Claimant takes issue with the Commissioner's contention that her part-time employment indicated that she was capable of working more than she was, and was not disabled. (Document No. 10 at 2.) Claimant sets forth her work history and asserts that she was terminated at a grocery store after two or three weeks because she was unable to do the work, she was terminated from her job with the Chamber of Commerce after three months because she was unable to perform "very simple tasks," and although she thought she could perform part-time work for the PTA, she psychologically was unable to sustain a full-time, 40-hour job. (Id.) She asserts that her employment at the time of the hearing, was through a senior placement program that made job placements amendable to her physical, mental, and overall vocational limitations. (Id.)

17

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to comply with 20 C.F.R. § 404.1527, in evaluating Ms. Guthrie's opinion. (Document No. 8 at 10-12.) Claimant asserts that the ALJ selected the portions of Ms. Guthrie's opinion that supported her conclusion that Claimant was not disabled. (Id. at 11.) In so doing, Claimant asserts that the ALJ failed to evaluate Ms. Guthrie's entire report and to consider her observations. (Id.)

In response, the Commissioner asserts that Claimant's reliance upon Ms. Guthrie's opinion is misplaced. (Document No. 9 at 18-19.) The Commissioner asserts that the ALJ considered Ms. Guthrie's examination findings and opinions, but noted that despite Ms. Guthrie's diagnosis of cognitive disorder, Dr. Rawal opined that Claimant's post-concussive syndrome had resolved and she had reached maximum medical improvement. (Id. at 18.) Moreover, the Commissioner asserts that Ms. Guthrie's diagnoses were based primarily on Claimant's subjective complaints. (Id. at 19.) Finally, the Commissioner asserts that Drs. Lilly and Boggess carefully considered Ms. Guthrie's findings and opinions prior to determining that Claimant did not have a severe mental impairment. (Id.) Accordingly, the Commissioner asserts that Ms. Guthrie's report "is not the ringing endorsement of disability [Claimant] believes," and therefore, that the ALJ properly evaluated Ms. Guthrie's opinion. (Id. at 19-20.)

Analysis.

1. Opinion Evidence.

Claimant also alleges that the ALJ erred in evaluating Ms. Guthrie's opinion. (Document No. 8 at 10-12.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2013). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent

18

of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2013). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In her decision, the ALJ summarized and considered Ms. Guthrie's examination findings.

(Tr. at 16.) She noted that Ms. Guthrie found that Claimant's concentration, pace, and social functioning were impaired mildly and that she diagnosed major depressive and cognitive disorders. (Tr. at 16.) Despite Ms. Guthrie's diagnosis of cognitive disorder, the ALJ noted that Claimant's treating neurologist, Dr. Rawal had concluded that her post-concussive syndrome, or cognitive disorder, had resolved. (Tr. at 16, 250.) Dr. Rawal opined that Claimant had reached maximum medical improvement, and was able to return to work without limitation. (Tr. at 250.) Ms. Guthrie specifically noted that her diagnosis of cognitive disorder was based on Claimant's self-report that she experienced mental confusion, memory impairment, and was unable to complete job tasks since her concussion. (Tr. at 449.) Likewise, her diagnosis of major depression was based on Claimant's subjective complaints of crying spells, fluctuating energy levels, varied appetite, and depressed mood. (Tr. at 448-49.)

In addition to Ms. Guthrie, the ALJ also considered the opinions of Dr. Boggess, who concluded that Claimant's depression and anxiety resulted in only mild limitations in maintaining concentration, persistence, or pace. (Tr. at 16.) The ALJ assigned substantial weight to this opinion. (Id.) The ALJ also considered the opinion of Dr. Lilly, who opined that Claimant had no more than mild functional limitations. (Tr. at 17.) She assigned little weight to Dr. Lilly's opinions regarding daily activities and social functioning in view of Claimant's testimony of varied activities and employment status. (Id.) Both these consultants opined that Claimant's mental impairments were non-severe in nature. Accordingly, the undersigned finds that the ALJ properly assessed Ms. Guthrie's opinion and that her decision is supported by substantial evidence.

2. RFC Assessment.

Claimant also alleges that the ALJ failed to include limitations in her RFC assessment to accommodate her post-concussion syndrome, major depressive disorder, and generalized anxiety

disorder; failed to consider Ms. Guthrie's findings; failed to include manipulative limitations; an failed to consider her stated as reported on June 29, 2011. (Document No. 8 at 6-10.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2013). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

As discussed above, Drs. Boggess and Lilly opined that Claimant's mental impairments were non-severe, and the ALJ appropriately relied on their opinions. The undersigned notes that despite Ms. Guthrie's assessment, she failed to indicate any restrictions on Claimant's ability to work. Furthermore, as discussed above, Claimant's treating neurologist concluded that Claimant's cognitive disorder had resolved. Accordingly, as a treating physician, his opinion was entitled greater weight than was Ms. Guthrie who examined Claimant on only one occasion.

Claimant further takes issue with the ALJ's failure to assess any manipulative limitations despite having been diagnosed with osteoarthritis of the hands. Despite such a diagnosis, the record

is void of any evidence that suggested Claimant required limitations for her hand condition. Drs. Franyutti and Pascasio failed to assess any such limitations. Accordingly, the undersigned finds that the record is void of evidence that Claimant required accommodations or limitations for the osteoarthritis of her hands, and therefore, finds that the ALJ's decision to not assess such limitations is supported by the substantial evidence of record.

Finally, despite Claimant's allegation that she would have been found disabled under Medical Vocational Rule 202.06, had the ALJ determined that she was unable to perform her past relevant work, the undersigned finds that Rule 202.06 is inapplicable because it requires that the previous work experience not have transferrable skills. 20 C.F.R. Pt. 404, Subpt. P, App. 2, 202.06. At the administrative hearing, the VE testified that Claimant had transferrable skills. (Tr. at 59-61.) Notwithstanding the transferrable skills, the ALJ alternatively found that Claimant was capable of performing other light work. Accordingly, the undersigned finds that Claimant's argument is without merit and that the ALJ's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 8.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 9.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 1, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

23